```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------X
```

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 1/30/06

MAURO ALBERTO ACOSTA, et al.,

Plaintiffs,

**MEMORANDUM AND ORDER**

- against -

05 Civ. 977 (NRB)

JPMORGAN CHASE & CO., et al.,

Defendants.

-----------------------------------X

**NAOMI REICE BUCHWALD**
**UNITED STATES DISTRICT JUDGE**

Plaintiffs, foreign country nationals,[1] bring this diversity action against JPMorgan Chase & Co. ("JPMC"), which is engaged in diversified financial and banking activities, and various individual defendants[2] ("director defendants") (collectively, "defendants") alleging that defendants participated in an international bank fraud which led to the failure of two of the largest commercial banks in Argentina and Uruguay. Defendants have moved to dismiss plaintiffs' complaint on various grounds.

---

[1] Plaintiffs are comprised of 339 individuals and corporate entities, all of whom are foreign country nationals, and most of whom are citizens of Argentina, Uruguay, or Panama. Am. Compl. at ¶ 7.

[2] Specifically, the complaint names William B. Harrison, Jr. ("Harrison"), Brian D. O'Neill ("O'Neill"), Joseph M. Martin ("Martin"), David C. Mulford ("Mulford"), and George B. Weiksner ("Weiksner"). Harrison, O'Neill, and Martin are represented by counsel for JPMC while Mulford and Weiksner are represented by separate counsel.

For the reasons set forth below, defendants' motion is granted on the basis of <u>forum non conveniens</u>.[3]

## BACKGROUND[4]

The allegations in the Amended Complaint ("Am. Compl." or "complaint") arise from the failure of two of the largest commercial banks in Argentina and Uruguay, General de Negocios S.A. ("BGN") and Banco Comercial Uruguay S.A. ("Banco Comercial"). Plaintiffs allege a series of frauds committed by BGN; Compania General de Negocios (Uruguay) S.A.I.F.E. ("CGN-SAIFE"), a Panamanian financial entity; and Banco Comercial.

## I. Underlying Fraud

### A. BGN and CGN-SAIFE

Beginning around 1991, CGN-SAIFE started an unregistered retail presence within the BGN branch office in Buenos Aires (the "Esmeralda Branch"). Through 2001, BGN solicited retail and commercial clients to invest in various CGN-SAIFE investment instruments. As a result of these solicitations, plaintiffs made several kinds of investments through CGN-SAIFE. Am. Compl. at ¶¶ 69, 71, 81.

---

[3] Because we dismiss on <u>forum non conveniens</u> grounds, we do not address defendants' other arguments.

[4] The following facts are drawn from plaintiffs' complaint and, as is appropriate when considering a motion to dismiss under Fed. R. Civ. P. 12(b)(6), are assumed herein to be true. Where appropriate, facts are also drawn from documents referenced in plaintiffs' complaint. See Rothman v. Gregor, 220 F.3d 81, 88 (2d Cir. 2000).

2

However, unbeknownst to plaintiffs the sole shareholder of CGN-SAIFE, San Luis Financial & Investment Co. ("San Luis"), incorporated a secret "twin" company, Compania General de Negocios (Uruguay) S.A. ("CGN-SAIV"), in the British Virgin Islands. According to plaintiffs, CGN-SAIV was incorporated for the sole purpose of perpetrating a fraud against CGN-SAIFE depositors, and numerous measures were taken to make it appear identical to CGN-SAIFE. As part of this scheme, duplicate accounts were established in plaintiffs' names at CGN-SAIV and were linked to plaintiffs' actual accounts at CGN-SAIFE. Through a series of fictitious transactions in which BGN actively participated, funds in the CGN-SAIFE accounts were then transferred to the corresponding CGN-SAIV accounts. Many plaintiffs first learned that they had been defrauded when they attempted to liquidate their CGN-SAIFE accounts in January 2001,[5] only to discover that these accounts had been emptied. Proceeds from these defrauded accounts were then used by BGN to advance "sweetheart loans" to friends of Carlos A. Rohm ("C. Rohm")[6] and other senior BGN officers. Id. at ¶¶ 92, 93, 95-99, 101, 104, 116, 117, 119, 120-23.

---

[5] This coincided with a pending economic crisis in the Argentina. Id. at ¶ 197.

[6] Plaintiffs allege that C. Rohm and his brother, Jose E. Rohm ("J. Rohm") (collectively, the "Rohm brothers") directly or indirectly owned and/or controlled various financial entities, including San Luis, involved in the international bank fraud alleged in the complaint. Id. at ¶ 68.

3

Plaintiffs allege that JPMC is liable under Argentine law for this fraud because of its ownership of twenty-six percent of the capital shares of BGN.[7]  Plaintiffs also allege that, because of its ownership stake in San Luis, JPMC was an indirect controlling company and shareholder of CGN-SAIFE and CGN-SAIV. Similarly, plaintiffs allege that the director defendants would be jointly and severally liable under Argentine law for failing to prevent the fraud and misconduct.  Id. at ¶¶ 124-26.

**B. Banco Comercial**

The complaint also alleges that certain Uruguay-based plaintiffs who were existing customers of Banco Comercial, were offered the opportunity to purchase "off-shore" investments. Similarly to BGN's use of CGN-SAIFE, plaintiffs allege that Banco Comercial used Commercial Investment Holding Corp. ("CIHC"), a limited liability company organized in Curacao, Netherlands Antilles, as a back-office operation to defraud clients in Uruguay.  Banco Comercial encouraged clients to establish accounts through CIHC, which in turn placed the deposits in CIHC accounts at ING Bank Holding, N.V. ("ING") branches in Curacao or Amsterdam.  Id. at ¶ 127-28, 132.

---

[7] Plaintiffs allege that JPMC, together with Credit Suisse First Boston ("CSFB") and Dresdner Bank ("Dresdner") (collectively, the "Shareholder Banks") were members of a consortium that partially owned and controlled the banks and financial institutions in which the plaintiffs invested.  Id. at ¶ 2.

## 1. U.S. **Treasury Bonds**

Eventually, plaintiffs allege that CIHC conveyed approximately $60 million to related parties including San Luis, CGN-SAIFE, and Banco Comercial, ostensibly to purchase U.S. Treasury Strips (Zero Coupon Bonds) ("UST-Bonds"). Plaintiffs allege that this conveyance was fraudulent and that CIHC never received UST-Bonds or any other value in return for the payment. Rather, the transactions were used to cover CGN-SAIFE's liquidity problems. Id. at ¶¶ 138-39, 141, 143-44, 149.

Plaintiffs allege that San Luis arranged to pay dividends to the Shareholder Banks using a CGN-SAIFE account at CSFB in New York, in violation of Uruguayan and Argentine law. In addition, San Luis allegedly made cash payments to its foreign directors through Banco Comercial, which was also a violation of Uruguayan and Argentine law. Id. at ¶¶ 152-53.

## 2. **Euronotes**

Plaintiffs also allege that Banco Comercial issued two $100 million tranches of ten-year unsecured bonds ("Euronotes"). Banco Comercial received approximately $198 million in proceeds from the sale of these Euronotes to various financial institutions (the "Euronote Holders"). Certain Euronote Holders subsequently resold beneficial interests in the Euronotes to individual investors, including some plaintiffs. Although Banco Comercial was obligated to pay interest and to repay the

principal on the Euronotes according to their terms, its insolvency in 2002 resulted in a default on payments to the holders of Euronotes. Id. at ¶¶ 154, 158, 161-62, 164-65.

The complaint alleges that the name of JPMC's predecessor "Chase Manhattan International Limited" appears prominently in both offering circulars for the Euronotes and that the Shareholder Banks were designated by Banco Comercial as "managers" of the Euronote issues. As evidence of the important role the Shareholder Banks played in this offering, plaintiffs point out that the Euronote Offering terms provided holders an assurance by giving them the option to redeem prior to maturity if the Shareholder Banks' collective ownership of Banco Comercial voting shares fell below 50%. In addition, plaintiffs allege that the Shareholder Banks used their existing prestige and brand to bolster sales of the Euronotes. In return, the Shareholder Banks received millions in proceeds from the sale of the Euronotes in the form of investment banking fees and loan repayments. Finally, plaintiffs allege that the director defendants at various times participated in and had oversight authority over the Banco Comercial asset and liability committee. Id. at ¶¶ 168-69, 171-72, 176-77, 186.

### 3. BONEX Bonds

Plaintiffs allege that between January 1997 and December 2001, Banco Comercial transferred approximately $209.9 million

6

to BGN through a series of sham bond purchase-and-sale transactions. For instance, Banco Comercial transferred $39.8 million to BGN during this period for the purchase of BONEX 92 bonds, which were a type of bond issued by the Argentine government. However, rather than purchasing the securities, BGN issued fake receipts. Plaintiffs allege that these sham purchases were repeated for numerous types of bond issues. Id. at ¶¶ 187, 189-91.

### 4. Balance Sheet Securities

Finally, plaintiffs allege that beginning in 1995 Banco Comercial violated Uruguayan law when it used nominal values rather than market values in reporting the value of publicly traded securities it reported as assets on its balance sheets. According to plaintiffs, this practice grossly overstated the value of these assets. Banco Comercial essentially had entered into sham future agreements whereby future purchasers agreed to purchase the securities at a specified price. Banco Comercial then carried these securities at the future agreed price, which greatly exceeded market value. The sole purpose of these actions was to create the illusion that Banco Comercial was solvent. Id. at ¶¶ 192-95.

### B. Subsequent Collapse and Charges

The severe crisis which rocked the Argentine economy in the fourth quarter of 2001 eventually led to the collapse of BGN,

7

CGN-SAIFE, and Banco Comercial in 2002.   During this time, C. Rohm was arrested by order of a criminal court in Argentina, and an arrest warrant was issued for J. Rohm.   Id. at ¶¶ 197, 203–05, 206-07.

## II. Defendants' Involvement

As discussed above, plaintiffs allege that JPMC, together with the other two Shareholder Banks, CSFB and Dresdner, were at all relevant times majority shareholders of Banco Comercial and BGN.   In addition, by dint of their 23% stake in San Luis, plaintiffs allege that the Shareholder Banks also owned shares of CGN-SAIFE and CGN-SAIV.   Id. at ¶ 216.

The Shareholder Banks began their relationship with Banco Comercial pursuant to an October 1990 agreement (the "Shareholder Agreement") by and among Chemical Bank, CSFB, Deutsch Sudamaerkikanische Bank, and San Luis.[8]   Pursuant to the Shareholder Agreement, the parties purchased 99.98% of the outstanding issued common shares of Banco Commercial from the government of Uruguay.   Responsibility for the daily management and operation of Banco Comercial was vested by the Shareholder Agreement in San Luis and the Rohm brothers.   In addition, a board of seven directors (the "Board") was established to oversee the management of Banco Comercial, and the Shareholder

---

[8] Plaintiffs allege that Chemical Bank was JPMC's predecessor-in-interest and that Deutsch Sudamaerkikanische Bank was Dresdner's predecessor-in-interest.

8

Banks were each entitled to designate one director.  Id. at ¶¶ 217-22.

Plaintiffs allege that the Shareholder Banks retained oversight authority over Banco Comercial by, among other things, requiring the Board to meet regularly and to approve certain kinds of transactions.  In addition, the Shareholder Banks were empowered to review Banco Comercial's financial reports and to audit its books.  Plaintiffs allege upon information and belief that the director defendants participated in numerous Board meetings and also reviewed financial statements.[9]  Id. at ¶¶ 225-26, 241-42.

## III. Plaintiffs' Complaint

The complaint contains thirteen counts.  Counts One and Two allege that any transfers to JPMC were fraudulent under New York Debtor & Creditor Law and that JPMC therefore is liable for damages and attorneys' fees and expenses.  Counts Four, Five, and Six assert various claims against JPMC under Uruguayan law, alleging that because of JPMC's ties to Banco Comercial, it is liable for Banco Comercial's actions.  Count Seven alleges that under Uruguayan law the director defendants, as directors of Banco Comercial, are jointly and severally liable for its

---

[9] During the events alleged, Harrison, O'Neil, and Martin were officers of JPMC and either directors or alternate directors of BGN and Banco Comercial.  During the same time, Mulford and Weiksner were officers of CSFB.  In addition, Mulford was an alternate director of BGN and both Mulford and Weiksner were directors of Banco Comercial. Id. at ¶¶ 20-30.

9

fraudulent actions. Counts Eight, Nine, Ten, Eleven, and Thirteen allege that, due to its interests in BGN, Banco Comercial, and San Luis (and therefore CGN-SAIFE and CGN-SAIV), JPMC is jointly and severally liable under Argentine law for their fraudulent actions. Count Twelve asserts that the director defendants are jointly and severally liable under Argentine law for the actions of BGN and CGN-SAIFE.

Defendants have moved to dismiss the complaint in its entirety. For the reasons set forth below, defendants' motion is granted on the basis of forum non conveniens.

## DISCUSSION

In considering a motion to dismiss, the Court must accept as true all material factual allegations in the complaint. Levy ex rel. Immunogen Inc. v. Southbrook Int'l Invs., Ltd., 263 F.3d 10, 14 (2d Cir. 2001). However, "[c]onclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to prevent a motion to dismiss." Smith v. Local 819 I.B.T. Pension Plan, 291 F.3d 236, 240 (2d Cir. 2002) (quoting Gebhardt v. Allspect, Inc., 96 F. Supp. 2d 331, 333 (S.D.N.Y. 2000)). A motion to dismiss may be granted only where "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Still v. DeBuono, 101 F.3d 888, 891 (2d Cir. 1996) (quoting Conley v. Gibson, 355 U.S. 41, 45-46 (1957)).

10

## I. Forum Non Conveniens

Defendants move to dismiss the complaint pursuant to the doctrine of forum non conveniens. Under this doctrine, "dismissal will ordinarily be appropriate where trial in the plaintiff's chosen forum imposes a heavy burden on the defendant or the court, and where the plaintiff is unable to offer any specific reasons of convenience supporting his choice." Piper Aircraft Co. v. Reyno, 454 U.S. 235, 249 (1981). The focus of any forum non conveniens inquiry is "to ensure that the place where a trial is held is convenient, that is, that the forum fits the needs and is suitable to the circumstances of the case." Pollux Holding Ltd. v. Chase Manhattan Bank, 329 F.3d 64, 67 (2d Cir. 2003). The evaluation of a motion to dismiss on grounds of forum non conveniens requires a three-step analysis of: (i) the degree of deference to accord plaintiffs' choice of forum; (ii) whether an adequate alternative forum exists; and (iii) the balance of private and public interests. See id. at 70 (citing Gulf Oil Corp. v. Gilbert, 330 U.S. 501 (1947)); Iragorri v. United Technologies Corp., 274 F.3d 65, 73 (2d Cir. 2001) (en banc); Base Metal Trading SA v. Russian Aluminum, 253 F. Supp. 2d 681, 693 (S.D.N.Y. 2003).

### A. Degree of Deference

The "first level of inquiry" is "determining whether the plaintiff's choice [of forum] is entitled to more or less

11

deference." Pollux, 329 F.3d at 67 (quoting Iragorri, 274 F.3d at 73). "While any plaintiff's selection of a forum is entitled to deference, that deference increases as the plaintiff's ties to the forum increase." Wiwa v. Royal Dutch Petroleum Co., 226 F.3d 88, 101-02 (2d Cir. 2000). Therefore, "when a foreign plaintiff sues in a United States forum such choice is entitled to less deference because one may not easily presume that choice is convenient." Id. at 71; see Iragorri, 274 F.3d at 71; see Varnelo v. Eastwind Transport, Ltd., 02 Civ. 2084 (KMW), 2003 WL 230741, at *12 (S.D.N.Y. Feb. 3, 2003) ("Foreign plaintiffs deserve less deference, not because they lack U.S. citizenship, but simply because their overseas residence vitiates any presumption that they would find the U.S. forum convenient."). In such cases, "it is more likely that forum-shopping for a higher damage award or for some other litigation advantage was the motivation for plaintiff's selection." Pollux, 329 F.3d at 71.

In this case, plaintiffs' choice of forum merits little deference. By their own admission, all 339 plaintiffs are foreign country nationals, and most of them are citizens of Argentina, Uruguay, or Panama. While this fact is not dispositive, we consider it a relevant factor in assessing relative convenience. See Base Metal Trading SA, 253 F.Supp.2d at 693.

12

In addition, plaintiffs do not claim significant ties to either New York or the United States. Plaintiffs allege merely that the South American banks involved in the underlying fraud "represented to [their] customers that they were owned and controlled by JPMC." Pl. Mem. at 36. Thus, plaintiffs argue, "[b]ecause [they] were led to believe they were making sound investments backed by a large U.S. bank, their choice to litigate in the U.S. against this bank should be accorded substantial deference." Id. We do not find this argument compelling. Indeed, it highlights that the underlying actions which are at the heart of the complaint were committed by foreign banks on foreign soil.[10] Plaintiffs themselves conceded at oral argument that they do not claim that the defendants in this action actively participated in the underlying fraud. Rather, the sole basis for defendants' liability is rooted in Argentine and Uruguayan law, which allegedly provide for joint and several liability.

Finally, plaintiffs point to a forum selection clause contained in the Shareholder Agreement signed by Chemical

---

[10] Plaintiffs also allege that New York "figured prominently" in the fraudulent scheme, as evidenced by the New York location of two (out of twelve) meetings of the Banco Comercial Board of Directors and the use of New York bank accounts in several fraudulent U.S. Treasury Bond transactions undertaken by the foreign banks. See Am. Compl. at ¶¶ 145-46, 241. However, these minimal interactions represent a negligible fraction of the events which occurred abroad.

13

Overseas Holdings, Inc.,[11] CSFB, Deutsche Sudamerikanische Bank Aktiengesellschaft, and San Luis. See Declaration of Louis B. Kimmelman, Esq. dated June 2, 2005 ("Kimmelman Decl.") ¶ 3 & Ex. B. Plaintiffs cite the clause as evidence that, at least when enforcing their own interest, defendants believe New York is an appropriate forum in which to litigate their own disputes. See Def. Mem. at 8-9. However, the Agreement is applicable to contract and tort claims relating to the signatories' respective duties to one another under the Agreement. As such, it would not govern the dispute in this case, which does not arise out of the Agreement. Cf. Bank of America Corp. v. Lemgruber, 385 F. Supp. 2d 200, 236 (S.D.N.Y. 2005) (finding forum selection clause inapplicable to fraudulent inducement claim). We also note that because none of the plaintiffs or defendants was a signatory to the Agreement, it is highly doubtful that it would even apply to any disputes with respect to these parties.[12] See Yung v. Lee, 04 Civ. 3139, 2005 WL 3453820, at *2 (2d Cir. Dec.

---

[11] As mentioned above, plaintiffs allege that JPMC is the owner of and/or successor in interest to Chemical Overseas Holdings, Inc.

[12] Indeed, we note that plaintiffs stated at oral argument that they do not claim any beneficiary status. In addition, aside from threatening to implead the other signatories as third-party defendants (which we do not believe would affect our analysis), plaintiffs do not dispute these conclusions. Rather, plaintiffs primarily rely upon the Agreement as proof of defendants' own views of New York as an appropriate forum as a general matter. See Def. Mem. at 35 n.88. Even if we accepted this contention, however, it would have no bearing on our analysis as to the motive behind, and corresponding deference given to, plaintiffs' choice of forum in this case.

14

15, 2005) (noting that "we are not convinced by plaintiffs' argument that a forum selection clause must be accorded special weight against non-signatories to the agreements").

In light of the fact that the vast majority of fraudulent events described in the complaint occurred abroad, we are hard pressed to identify any bona fide connection to plaintiffs' chosen forum. Because plaintiffs' choice seems to have been guided more by considerations of tactical advantage than convenience, we accord it little deference.

## B. Adequate Alternative Forum

"To secure dismissal of an action on grounds of forum non conveniens, a movant must demonstrate the availability of an adequate alternative forum." Norex, 416 F.3d at 157. Generally, this requirement "will be satisfied when the defendant is 'amenable to process' in the other jurisdiction. In rare circumstances, however, where the remedy offered by the other forum is clearly unsatisfactory, the other forum may not be an adequate alternative. . . ." Aguinda v. Texaco, Inc., 303 F.3d 470, 476 (2d Cir. 2002) (quoting Piper, 454 U.S. at 255 n. 22).

As evidence that they are amenable to process in Uruguay, defendants assert that they are already actively defending

15

themselves in currently pending litigation in Uruguay.[13]  ·In support thereof they have provided a copy of a complaint filed in Uruguay against numerous defendants, including all of those named in this action.   See Declaration of Andres M. Cerisola dated June 3, 2005 ("Cerisola Decl.") ¶¶ 39-40; Declaration of Andres M. Cerisola dated October 6, 2005 ("Cerisola Reply Decl.") ¶¶ 13-14, Ex. E.   Plaintiffs offer no evidence to dispute this assertion.[14]   In light of the above, it is clear that defendants are amenable to process in Uruguay.

Plaintiffs also argue that Uruguay offers an unsatisfactory remedy because of systemic bias in favor of international banks and the likely delay of litigating such a case.[15]   As stated in plaintiffs' supporting affidavits, "it is questionable at best that the courts of Uruguay would ever render a judgment against

---

[13] Defendants also assert that one of the plaintiffs in this action is also a plaintiff in one of the actions currently pending against them in Uruguay.

[14] We also note that in defendants' affidavits, they assert that all defendants would be subject to the jurisdiction of Uruguayan courts because under Uruguayan law, if a court has subject matter jurisdiction over the legal action (which plaintiffs do not dispute here) it can assert jurisdiction to rule on claims against all defendants linked to that action.  See Cerisola Reply Decl. ¶ 13. Plaintiffs submit affidavits stating merely that "it appears that not all the Defendants in this case are subject to the jurisdiction of Uruguayan courts-- for example JPMC does not have a domicile in Uruguay nor was it authorized to operate as a bank in Uruguay…." Etcheverry Decl. ¶ 28.

[15] Plaintiffs do not dispute that Uruguay would permit litigation of the subject matter of this case.  Indeed, approximately 2,000 plaintiffs have already joined in numerous civil actions filed in Uruguay against many of the same defendants and which involve allegations similar to those made here.  See Cerisola Decl. ¶ 39.

16

the international banks when it has traditionally been Uruguayan policy to protect international financial operators from legal proceedings." Declaration of Martin Etcheverry dated September 15, 2005 ("Etcheverry Decl.") ¶ 30.

In support of their assertions of corruption and bias, plaintiffs cite a purportedly "secret agreement" in 2002 ("2002 Agreement") between the Uruguayan government and the Shareholder Banks in which the banks agreed to purchase BC stock in exchange for a promise by the government not to bring any action against them. In response, defendants have provided the public press release announcing the 2002 Agreement and also affirm that litigation has since ensued between the Uruguayan government and the Shareholder Banks after the government refused to honor the 2002 Agreement.

In light of these submissions, plaintiffs' unsubstantiated allegations of corruption and bias are not compelling.[16] See Monegasque De Reassurances S.A.M. v. Nak Naftogaz of Ukraine, 311 F.3d 488, 499 (2d Cir. 2002) (refusing to find foreign courts corrupt or biased where plaintiff advanced conclusory and sweeping generalizations); Blanco v. Banco Indus. de Venezuela, S.A., 997 F.2d 974, 982 (2d Cir. 1993) ("It is not the business

---

[16] Plaintiffs' citation to a survey published by Transparency International, which reports the "perceived corruption" in various sectors of countries worldwide, see Am. Compl. at ¶¶ 233-37, is insufficient to change this conclusion.

17

of our courts to assume the responsibility for supervising the integrity of the judicial system of another sovereign nation." (quoting Chesley v. Union Carbide Corp., 927 F.2d 60, 66 (2d Cir. 1991)); see also Eastman Kodak Co. v. Kavlin, 978 F.Supp. 1078, 1084 (S.D.Fla. 1997) ("The 'alternative forum is too corrupt to be adequate' argument does not enjoy a particularly impressive track record.") (collecting cases).

Plaintiffs also argue that Uruguay is not an adequate forum because litigating the case there would entail considerable delay. In support of this argument, plaintiffs cite a bank liquidation case which was still pending for over thirty years. See Etcheverry Decl. ¶ 37. Extrapolating from this example, they seem to suggest that the same necessarily would happen in this case. Such an unsupported assertion is "speculative at best" and therefore we find it unavailing. See Moscovits v. Magyar Cukor Rt., 00 Civ. 0031 (VM), 2001 WL 767004, at *4 (S.D.N.Y. July 9, 2001). In further support, plaintiffs cite examples of practices in Uruguayan courts which they claim are more burdensome than those found in U.S. courts. See Etcheverry Decl. ¶ 38. However, an alternative forum need not be perfect to be adequate, and we cannot say that such procedures would render any remedy clearly unsatisfactory. See Blanco, 997 F.2d at 982 ("[S]ome inconvenience or the unavailability of beneficial litigation procedures similar to those available in

18

the federal district courts does not render an alternative forum inadequate." (quoting Borden, Inc. v. Meiji Milk Prods. Co., 919 F.2d 822, 829 (2d Cir. 1990)).

In short, "[t]his simply is not a case where the alternative forum is characterized by a complete absence of due process or an inability of the forum to provide substantial justice to the parties." Monegasque, 311 F.3d at 499. Therefore, we find that defendants have borne their burden of demonstrating the availability of an adequate alternative forum.

## C. Balance of Private and Public Interest Factors

### 1. Private Interest Factors

Having found Uruguay to be an adequate alternative forum, we now weigh the private and public interest factors outlined in Gilbert, 330 U.S. at 508-09. Private interest factors to be considered include: "1) the relative ease of access to sources of proof; 2) the convenience of willing witnesses; 3) the availability of compulsory process for attaining the attendance of unwilling witnesses; and 4) the other practical problems that make trial easy, expeditious, and inexpensive." Base Metal Trading SA, 253 F. Supp. 2d at 710 (citing Gilbert, 330 U.S. at 508). In applying these factors we "focus on the precise issues that are likely to be actually tried, taking into consideration the convenience of the parties and the availability of witnesses

19

and the evidence needed for the trial of these issues." Monegasque, 311 F.3d at 500 (quoting Iragorri, 274 F.3d at 74).

In this case, the complaint asserts that defendants are liable only insofar as they are jointly and severally liable for fraudulent acts committed by BGN, CGN-SAIFE, and Banco Comercial, which are based in Argentina, Panama, and Uruguay, respectively. The defrauding of investors occurred overwhelmingly in Argentina and Uruguay and was directed at Argentine and Uruguayan residents. Specifically, the BGN and CGN-SAIFE fraud centered on accounts affiliated with the Esmeralda Branch of BGN in Argentina while Banco Commercial's fraudulent activities were directed primarily at customers in Uruguay.

Correspondingly, as supported by plaintiffs' own allegations, the overwhelming amount of documentary proof about these activities would be located in Argentina and Uruguay. Similarly, nearly all of the relevant non-party witnesses would be resident in those countries.[17] The cost and burdens imposed on both parties for bringing those witnesses here would be considerable. These factors therefore favor dismissal. See Base Metal Trading SA, 253 F. Supp. 2d at 710-12 (granting forum

---

[17] Defendants have submitted compelling evidence that this would indeed be true. See Cerisola Decl. ¶¶ 18, 31, 34, 38, 42; Duggan Decl. ¶¶ 11-13, 16, 21-23, 25-26.

20

non conveniens dismissal where majority of non-party witnesses and documents were located in plaintiffs' home forum).

We also note that nearly all the relevant documents are written in Spanish. While plaintiffs are correct that this factor is not dispositive, it appropriately is considered in this analysis, as it would affect the ease and financial costs of trial. See, e.g., Monegasque, 311 F.3d at 500 (noting language used in pertinent documents in weighing private interest factors); Blanco, 997 F.2d at 982 (noting that use of Spanish in documentary evidence "militates strongly in favor of Venezuela as a more appropriate forum for this litigation"); Base Metal Trading SA, 253 F. Supp. 2d at 712 ("The need for extensive document translation supports a finding that this forum is inconvenient."). In light of the above, it appears that any proceeding would be comparatively "easy, expeditious and inexpensive" if conducted in Uruguay. Monegasque, 311 F.3d at 500. Accordingly, we conclude that the balance of private interest factors favors dismissal.

## 2. **Public Interest Factors**

Public factors to be considered include: "1) court congestion; 2) avoiding difficult problems in conflict of laws and the application of foreign law; 3) the unfairness of imposing jury duty on a community with no relation to the case; and 4) the interest of communities in having local disputes

21

decided at home." Base Metal Trading SA, 253 F. Supp. 2d at 712 (citing Gilbert, 330 U.S. at 509).

From the outset, it is clear that this case will require extensive applications of both Uruguayan and Argentine law. Eleven of the thirteen counts in the complaint are asserted under the laws of both foreign countries, and plaintiffs rely upon principles in Uruguayan and Argentine law to establish a basis for extending liability from the actual parties who committed the fraud to the defendants. Both parties have submitted affidavits with conflicting interpretations of the relevant Uruguayan and Argentine laws, and we do not doubt that it would be necessary to "untangle" these problems if the case proceeded here. See Scottish Air Intern., Inc. v. British Caledonian Group, PLC, 81 F.3d 1224, 1234 (2d Cir. 1996).

In addition, this case has very little connection with either the United States or this district. Defendants are allegedly liable only indirectly under theories of Uruguayan and Argentine law. By contrast, Uruguay has an immense interest in this case. The allegations in part involve events leading to the demise of one of that country's oldest and most prominent banks, and involve accusations that the bank defrauded many of its own citizens. We also note that numerous bankruptcy, criminal, and civil actions involving these events are pending

22

in Uruguay.  In light of the above, we find that both public and private interest factors weigh in favor of dismissal.

**CONCLUSION**

For the reasons set forth above, defendants' motion to dismiss is granted on the grounds of <u>forum</u> <u>non</u> <u>conveniens</u>, and all claims against defendants are dismissed.

**SO ORDERED**.


Dated:    New York, New York
          January 30, 2006

                              NAOMI REICE BUCHWALD
                              UNITED STATES DISTRICT JUDGE

Copies of the foregoing Memorandum and Order have been mailed on this date to the following:

Counsel for Plaintiffs

Bruce S. Koppel, Esq.
10 Depot Square
P.O. Box 348
Englewood, NJ 07631

Counsel for Defendants JPMorgan Chase & Co., William B.
Harrison, Jr., Brian D. O'Neill, and Joseph M. Martin

Louis B. Kimmelman, Esq.
Martin Glenn, Esq.
O'Melveny & Myers LLP
Times Square Tower
7 Times Square
New York, NY 10036

Counsel for Defendants David C. Mulford and George B.
Weiksner

Henry Weisburg, Esq.
Tai H. Park, Esq.
Shearman & Sterling LLP
599 Lexington Avenue
New York, NY 10022